444

THE STATE OF WASHINGTON, *Respondent*, v. N.S.T., *Appellant*.

*Vanessa Mi-jo Lee* (of *Washington Appellate Project*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Ann M. Summers, Deputy*, for respondent.

¶1 LEACH, A.C.J. — The Juvenile Justice Act of 1977, chapter 13.40 RCW, authorizes a court in certain circumstances to defer disposition of a juvenile, order restitution, and revoke the deferred disposition if restitution goes unpaid. A juvenile court revoked N.S.T.'s deferred disposition for failing to pay her court-ordered restitution. She appeals, contending that (1) the trial court lacked authority to revoke because the period of supervision had expired; (2) the State's failure to file a written motion to revoke deprived her of adequate notice; and (3) the disposition order, based solely on her failure to pay, violated her due process and equal protection rights under the Fourteenth Amendment to the United States Constitution because the court did not affirmatively find that this failure was willful.

¶2 Because a revocation proceeding was pending before the supervisory period expired, we hold that the trial court had authority to revoke. We also hold that the juvenile probation counselor's written report provided N.S.T. with

constitutionally adequate notice of the reason for the revocation hearing. Finally, we conclude that N.S.T. failed to meet her burden of establishing that her inability to pay was not willful. We affirm.

## FACTS

¶3 In June 2006, N.S.T. and a group of children went to R.R.'s house, where a fight broke out over an iPod. The fight took place on R.R.'s porch. At some point during the mêlée, N.S.T. threw a large rock through the living room window. R.R.'s father broke up the fight and restrained N.S.T. until the police arrived. N.S.T. was 14 years old.

¶4 The State charged N.S.T. with residential burglary and malicious mischief in the first degree. In December 2006, she stipulated to the charges, and the juvenile court granted N.S.T.'s motion for deferred disposition, continuing the matter for 12 months. Terms of the deferred disposition included community supervision, 40 hours of community service, counseling, mandatory school attendance, residency requirements and curfew, a prohibition on drugs and alcohol, and restitution in the amount of $2,630.40, payable at a minimum rate of $10.00 per month.

¶5 In November 2007, a juvenile probation counselor (JPC) submitted a report indicating that N.S.T. was in full compliance with all of these terms except one, payment of restitution. Because an outstanding balance was still owed, the court extended the deferral until November 30, 2008. By November 2008, N.S.T. had paid $235.00 towards her restitution obligation, leaving an outstanding balance of $2,341.29.[1] Early that same month, a JPC submitted a deferred disposition review report to the court indicating that unless N.S.T. provided verification of payment of her remaining financial obligation, he recommended that the matter be set for revocation.

¶6 On November 7, the court continued the matter until the middle of December. The order indicated that the

---

[1] The record does not reflect how this number was obtained.

parties jointly agreed to continue the "motion to revoke." At the request of N.S.T.'s attorney, the hearing was again continued until December 30. On the morning of the 30th, N.S.T.'s attorney filed a motion to vacate, arguing that because the period of supervision expired in November, the court no longer had authority to revoke. The court then granted the State's motion to continue so that it could prepare a response. The matter was reset for January 6, and N.S.T. waived her right to be present at that hearing. At the hearing, the court determined that it still had authority to revoke and denied N.S.T.'s motion to vacate. It then reset a revocation hearing for later that month.

¶7 At the final revocation hearing, held January 27, 2009, the State argued that N.S.T. was not in substantial compliance with the terms of her deferred disposition because she had not paid her restitution in full. Defense counsel observed that, while employed, she made payments totaling $235, just $5 shy of the amount owed at the minimum rate of $10 per month.

¶8 N.S.T.'s mother also testified that she was a single mother paying what she could before her daughter gained employment and that both her hours and her daughter's had been cut, making it difficult to pay routine household bills. Though sympathetic to N.S.T.'s position, the trial court revoked the deferred disposition, stating,

> You did everything that you were asked to do with the exception of the financial obligations. So, you should feel proud of the fact that you completed those community service hours. . . . But, I am bound by the confines [of] the legislature. . . . I have no option but to revoke the deferred, okay?
>
> Somebody should go down and lobby Olympia about this.

N.S.T. appeals.

## STANDARD OF REVIEW

■ ¶9  We review de novo whether a juvenile court had authority to act and did so in compliance with the Juvenile Justice Act of 1977.[2]

## ANALYSIS

¶10  We first must decide whether the juvenile court had authority to revoke N.S.T.'s deferred disposition in January 2009 when the period of supervision was set to expire in November 2008.

¶11  The Juvenile Justice Act (JJA) establishes a framework for the deferred disposition of juvenile offender cases. The JJA authorizes the juvenile court to defer disposition of the juvenile's case for a period not to exceed one year after the juvenile is found or pleads guilty.[3] As part of the deferral, the court may also impose terms, including payment of restitution.[4] If the juvenile satisfies these terms by the expiration of the deferral period, the court vacates the conviction and dismisses the case with prejudice.[5] But if the court finds "upon written motion by the prosecutor or the juvenile's juvenile court community supervision counselor" that the juvenile failed to comply with the terms of supervision, the court shall enter an order of disposition.[6] Finally, at any time after deferral, upon a showing of good cause, the court may continue the case for an additional one-year period.[7]

■ ¶12  Washington courts construing the JJA have developed a bright-line rule that a court's authority to

---

[2] *State v. Beaver*, 148 Wn.2d 338, 344, 60 P.3d 586 (2002).

[3] RCW 13.40.127(2), (4).

[4] RCW 13.40.127(5).

[5] RCW 13.40.127(9).

[6] RCW 13.40.127(7).

[7] RCW 13.40.127(8).

revoke a deferred disposition order terminates upon the expiration of the supervisory period unless violation proceedings are initiated before the period expires. In *State v. May*,[8] the court decided whether a juvenile court retains authority under RCW 13.40.200 to consider violations occurring during the period of community supervision but not brought to the court's attention until after the period ends. The *May* court answered this question no, holding that a juvenile court's authority "to enforce its disposition order terminates when the community supervision period expires, unless a violation proceeding is then pending before the court."[9] And since the prosecutor in that case initiated a show cause hearing one week after the supervisory period ended, the trial court's order imposing detention for violation of the disposition order was reversed.

¶13 Three years later, in *State v. Y.I.*,[10] we considered whether the juvenile court retained statutory authority to sanction a juvenile under RCW 13.40.200 for failing to pay his victim penalty assessments (VPA). Citing *May*, we held that the juvenile court's authority to enforce a juvenile's financial obligations under a disposition order, including VPAs, expires upon the termination of the supervisory period.[11] One year later, in *State v. Todd*,[12] the court addressed yet another application of the *May* bright-line rule. In that case, the juvenile court entered a deferred disposition under RCW 13.40.127(7) imposing 12 months of community supervision upon Todd and requiring that he commit no further " 'law violations.' "[13] Three weeks before the expiration of the supervisory period, the State accused Todd of malicious mischief and moved to revoke his deferred disposition. At a hearing held one month after the supervi-

---

[8] 80 Wn. App. 711, 714, 911 P.2d 399 (1996).

[9] *May*, 80 Wn. App. at 716-17.

[10] 94 Wn. App. 919, 922-23, 973 P.2d 503 (1999).

[11] *Y.I.*, 94 Wn. App. at 924.

[12] 103 Wn. App. 783, 789-90, 14 P.3d 850 (2000).

[13] *Todd*, 103 Wn. App. at 785.

sory period ended, the juvenile court found the State's motion untimely and dismissed.[14] In reversing, the Court of Appeals expressly applied *May*'s bright-line rule, noting that the juvenile court loses authority "to enforce a disposition order only if the State fails to *institute* violation proceedings before the expiration of the deferral period."[15] Since the State had commenced revocation proceedings before the supervisory period ended, the juvenile court retained authority to revoke.

¶14 In this case, *May* and *Todd* are dispositive. N.S.T.'s deferral period expired on November 30, 2008. Sometime before November 7, 2008, a full three weeks before the supervisory period was to expire, N.S.T.'s JPC submitted a report to the court recommending revocation in the event that N.S.T. failed to pay restitution in full. The report stated, "Rather than asking for supervision to be extended 1 more month, should N[.S.T.] be unable to provide verification of payment of her remaining financial obligations, probation recommends that this matter be set out for revocation."

¶15 The agreed order entered at the November 7 hearing states that both parties agreed to continue the "motion to revoke" until mid-December. The case was continued twice more, once at the request of N.S.T. and once at the request of the State. N.S.T.'s deferred disposition was finally revoked in January 2009. Because the revocation proceeding was initiated before November 30, 2008, the juvenile court had authority to revoke N.S.T.'s deferred disposition at the final hearing in January 2009.

¶16 We next must decide N.S.T.'s claim that RCW 13.40.127(7) obligated the State to file a "formal written notice" of the basis for revocation and whether the State's supposed failure to do so deprived N.S.T. of due process.

¶17 As an initial matter, N.S.T. mistakenly contends that RCW 13.40.127(7) requires the State to file a written

---

[14] *Todd*, 103 Wn. App. at 786.

[15] *Todd*, 103 Wn. App. at 790.

motion. This statute plainly states that either the *"prosecutor or the juvenile's juvenile court community supervision counselor"* may initiate revocation proceedings. (Emphasis added.) The trial court recognized in its January 6 ruling that there is no "require[ment] that th[ere] be a formal written notice in some form saying we are the prosecutor, we are moving for revocation . . . because the JPC's [sic] often move for revocation."

■ ¶18 Since the express terms of the statute authorize either a JPC or a prosecutor to initiate revocation proceedings upon written motion, the questions are whether a written motion was filed in this case and whether it fulfilled N.S.T.'s due process rights. Citing *May* and our Supreme Court's holding in *State v. Dahl*,[16] N.S.T. claims that she was deprived of "formal written notice" and due process of law. But these cases support the State's position, not N.S.T.'s.

¶19 In *May*, the court determined that the prosecutor's untimely motion provided adequate notice. The motion alleged that May had failed to complete community service, attend school regularly, keep scheduled appointments, and avoid contact with his codefendant.[17] In a footnote, the court observed that May received the same due process as would be afforded an adult probationer.[18] In *Dahl*, the court held that before a hearing to revoke a special sex offender sentencing alternative sentence, due process requires that the State "inform the offender of the specific violations alleged and the facts that the State will rely on to prove those violations."[19]

¶20 Here, the JPC filed a written document with the court titled "Deferred Disposition Review Report to Court." This document explicitly stated that N.S.T. had complied

---

[16] 139 Wn.2d 678, 990 P.2d 396 (1999).

[17] *May*, 80 Wn. App. at 713.

[18] *May*, 80 Wn. App. at 714 n.2.

[19] *Dahl*, 139 Wn.2d at 685.

with all of her court-ordered obligations except for the restitution requirement and that unless she provided verification of payment of restitution, her deferred disposition should be set for a revocation hearing. A short time later, but still within the supervisory period, the JPC filed a second document with the court titled "Deferred Disposition, Revocation Report to Court." This report repeated the assertion that N.S.T. fulfilled all of her court-ordered obligations except her restitution obligation. It then stated that "[i]f case is revoked[,] we recommend no additional sanctions."

¶21 Read together, these documents notified N.S.T. of proceedings that would result in revocation of her deferred disposition if she had not paid the full amount of restitution ordered before the hearing date. N.S.T. confirmed that these documents provided this notice to her when she argued in her brief in support of her claim that the juvenile court lacked authority to revoke:

> On November 7, 2008, there was still outstanding restitution. *The JPC submitted a report for that hearing recommending dismissal if the restitution was paid and recommending that it be set over for revocation if the restitution was not paid.* The Court struck the review hearing and set a revocation hearing for December 15, 2008.

(Emphasis added.) We conclude that N.S.T. was provided with adequate written notice that the JPC was recommending revocation of her deferred disposition due to her failure to pay restitution. Thus, N.S.T. received all the notice she was entitled to under the law.

¶22 Finally, we decide whether the juvenile court's revocation of N.S.T.'s deferred disposition, done without any finding that her failure to pay restitution was willful, violated her due process and equal protection rights under the Fourteenth Amendment to the United States Constitution.

¶23 N.S.T. relies primarily upon *Bearden v. Georgia*,[20] where the United States Supreme Court held that a sentencing court could not revoke a defendant's probation for failure to pay a fine and restitution without evidence and findings that the defendant was somehow responsible for the nonpayment or that alternative forms of punishment were inadequate. The State claims that *Bearden* does not apply because N.S.T. was not incarcerated for her failure to pay. Both parties misread *Bearden*.

¶24 In *Bearden*, the Court stated that it had long been sensitive to the treatment of indigents in our criminal justice system and noted its prior holding that the State cannot convert a fine into a jail term solely because a defendant cannot immediately pay that fine.[21] At the same time, the Court recognized limits on the principle of protecting indigent defendants.[22]

¶25 The Court stated that "the reason[ ] for nonpayment[ ] is of critical importance."[23] Under *Bearden*, a sentencing court must inquire into the reasons for an indigent defendant's failure to pay on his or her court-imposed financial legal obligations. If a defendant willfully refuses to pay or evidences an insufficient concern for paying the debt owed, the court may revoke probation.[24] But if a defendant fails to pay despite sufficient bona fide efforts to satisfy his legal debts, the court must consider and reject alternative measures of punishment before a period of incarceration may be imposed.[25] Focusing on the reason for noncompliance balances unlawful discrimination against the poor on the one hand and the State's interest in punishing criminal offenders on the other hand.

---

[20] 461 U.S. 660, 668-69, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983).

[21] *See Bearden*, 461 U.S. at 664 (citing *Tate v. Short*, 401 U.S. 395, 399, 91 S. Ct. 668, 28 L. Ed. 2d 130 (1971)).

[22] *Bearden*, 461 U.S. at 664-65.

[23] *Bearden*, 461 U.S. at 668, 672.

[24] *Bearden*, 461 U.S. at 668, 672.

[25] *Bearden*, 461 U.S. at 672.

¶26 N.S.T. confuses the court's instruction to inquire into the economic status of the noncompliant defendant with the burden-shifting scheme that applies during the inquiry. For example, in *State v. Woodward*,[26] the court noted that under provisions of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, the State bears the initial burden of proving by a preponderance of the evidence that a defendant has failed to meet the terms of his or her sentencing conditions. "If the State proves the defendant's failure to comply, the burden shifts to the defendant to show cause why he or she should not be punished."[27] To meet this burden, the defendant must do more than plead poverty in general terms: he or she should be prepared to show the court proof of (1) actual income, (2) reasonable living expenses, (3) efforts to find legal means to acquire employment and other resources from which restitution may be paid, and (4) any lawful excuse explaining any failure to comply with the terms of community supervision.[28] This analytic framework is consistent with the rule that "[w]hen the probationer has made reasonable efforts to meet his court-ordered financial obligations, and yet cannot do so, through no fault of his own, it is ' "fundamentally unfair to revoke probation automatically." ' "[29]

¶27 We hold that the same analysis applies to juvenile revocation proceedings under the JJA. Like the SRA, the JJA states, "The state shall bear the burden to prove, by a preponderance of the evidence, that the juvenile has failed to comply with the terms of community supervision," including failure to pay restitution.[30] Accordingly, if the State

---

[26] 116 Wn. App. 697, 702, 67 P.3d 530 (2003) (citing *State v. Peterson*, 69 Wn. App. 143, 146, 847 P.2d 538 (1993)).

[27] *Woodward*, 116 Wn. App. at 702 (citing *Peterson*, 69 Wn. App. at 146).

[28] *Woodward*, 116 Wn. App. at 704 (quoting *State v. Bower*, 64 Wn. App. 227, 233, 823 P.2d 1171 (1992)).

[29] *Woodward*, 116 Wn. App. at 704 (quoting *Bower*, 64 Wn. App. at 232 (quoting *Bearden*, 461 U.S. at 668)).

[30] RCW 13.40.127(6).

meets this burden, the burden shifts to the juvenile defendant to prove that his or her noncompliance was not willful.

¶28 Applying this rule to the facts of this case is straightforward. N.S.T. admits that she paid only $235 of the total $2,600 owed. The State therefore met its burden of proving by a preponderance of the evidence that N.S.T. failed to pay restitution after 24 months.[31] At the final restitution hearing, the court specifically asked N.S.T.'s counsel, "[W]hat information do I have about efforts to pay over the course of [the deferral period]?" Her counsel informed the court that "[N.S.T.] is currently employed. I know she was unemployed for a while. When she was employed she made $235 worth of payments. So, that's what she was able to pay. That's what she paid over the course of this deferred disposition." And her mother stated,

> I was actually paying what I could before she got employed. Uhm, my job is at a freeze, so they cut down everyone's hours. I have household bills; I'm a single mom, too. So, I'm doing the best I can. And my household bills come first. You know, if I have anything extra, it usually goes to gas. I'm barely feeding my kids. [N.S.T.'s] working. Her hours got cut. They have to call in to see if they even have to work.

Absent from the record, however, is any direct evidence documenting actual income, assets, reasonable living expenses, or efforts to find other legal resources from which restitution might have been paid over the course of 24 months. Without such evidence, N.S.T. could not meet her burden of proving that she made sufficient bona fide efforts to comply with her restitution obligation.

---

[31] N.S.T. suggests that she was near total compliance because she had been paying at nearly $10 a month. This argument overlooks the fact that she was ordered to pay restitution on the full $2,600 within the 24 months and that the minimum monthly installment at $10 was the least she could pay in any given month without violating the order. Paying the minimum monthly amount was therefore necessary but not by itself sufficient to avoid revocation for noncompliance.

## CONCLUSION

¶29 We affirm. The juvenile court had authority to revoke the deferred disposition order, the JPC's report satisfied N.S.T.'s minimum notice requirements, and N.S.T. failed to meet her burden of establishing her sufficient bona fide efforts to pay the amount of restitution owed.

ELLINGTON and SCHINDLER, JJ., concur.